In the Matter of Tyrone Fullen
ANDERSON.
In re Bobby ISAAC.
In re Charles E. PORTER.
In re James Boyd DREWRY.
In re John WEAVER.
In re Cornell Fernandis MAYS.
In re Jesse James PRICE.
In re Irvin Lowery RAY.
In re Victor Arnold MIMS.
In re Clevester PARMER.
In re Thomas William WHITE, Jr.
In re Luther Elwood WEAVER, III.
In re Walter Oliver NEAL.
In re William Earl BEST, Jr.
Misc. Nos. 32-69, 34-69-35-69, 37-69-42-69, 44-69, 45-69, 47-69-48-69, 51-69.

United States District Court
District of Columbia.
June 20, 1969.

Alfred Hantman, Harold Sullivan, Asst. U. S. Attys., for United States.

R. Kenneth Mundy, Washington, D.C., for Tyrone Fullen Anderson, Charles E. Porter, John Weaver, Victor Arnold Mimms, Clevester Parmer and Walter Oliver Neal.

Dovey Roundtree and John W. Days, Washington, D. C., for Bobby Isaac, Jesse James Price and Irvin Lowery Ray.

Fortunato J. Mendes, Washington, D. C., for James Boyd Drewry.

Richard J. Hopkins, Washington, D.C., for Cornell Fernandis Mays, Luther Elwood Weaver, III and William Earl Best, Jr.

DeLong Harris, Washington, D.C., for Thomas William White, Jr.

## MEMORANDUM OPINION

GESELL, District Judge.

On May 6, 1969, this Court issued a Temporary Restraining Order in favor of The Howard University when that institution sought to enjoin acts of student protesters and others which had disrupted the campus with some attendant violence and forced the University to discontinue much of its educational program. Two days later Howard University presented evidence to the Court that the campus turmoil was continuing and that large groups of students and others continued to occupy the buildings and engage in other conduct that violated the Temporary Restraining Order to the damage of the University's property and program. The Court on this proper showing issued orders of arrest and in the early morning hours of May 9 a group of 20 persons, including students and non-students, were arrested by the United States Marshals and later that day arraigned and released under various bond restrictions pending trial. At arraignment those arrested were charged with criminal contempt under 18 U.S.C. § 402.

The United States Attorney undertook the prosecution of these criminal cases which, under the Code, require a jury trial. Full pretrials and other preliminary proceedings were held on June 5 and 6. Trials of various groups of defendants were promptly scheduled for June 10, 11, 12, 13, 19 and 27. On June 10, five defendants involved in the matter were called for trial; two defendants pled guilty and the remaining three defendants proceeded to trial before a jury.

On the evening of the first day of trial there appeared in *The Evening Star* a full-page paid advertisement of uncertain origin entitled "Campus Unrest at Howard: Demands and Responses", which reviewed in a one-sided fashion events up to the time of trial in more or less chronological order. The advertisement carried a facsimile of The Howard University seal but was not signed. The next morning, June 11, while the trial was still in progress, an identical full-page advertisement appeared in *The Washington Post*. These advertisements spoke of damage and vandalism, including arson; they accused the students of responsibility for these conditions and injuries to police, marshals and others. The advertisements made reference to the students' disobedience of the Court Order and pictured the faculty as tolerant, understanding, restrained and working constantly toward betterment of the conditions on campus which the students were said to have criticized.

These advertisements brought an immediate reaction from defense counsel in the contempt cases. A mistrial was sought for the case on trial but this was not granted when it appeared, after a special voir dire of each individual member of the jury, that the jury had scrupulously observed the Court's previous admonitions against contact with publicity and no member of the jury had seen the advertisement in either newspaper.

On June 11 and 12, counsel for the other defendants still awaiting trial moved the Court to cite Howard University for contempt and to dismiss the pending actions on the ground that prejudicial publicity precluded a fair and speedy trial. These motions were immediately set for hearing on the afternoon of June 12 and counsel for Howard University, together with University officials, were brought before the Court for questioning.

Rule 100(3) of this Court, issued on April 21, 1969, is concerned with Free Press-Fair Trial and provides in pertinent part as follows:

(3) No attorney who has undertaken the representation of a defendant nor the prosecutor in a criminal case, whether that case is in progress or imminent, shall release or authorize the release of information not in the

public record for dissemination by any means of public communication which is likely to interfere with a fair trial or otherwise prejudice the due administration of justice. * * *

In view of the timing of the advertisements and their content it is clear that this publication was "likely to interfere with a fair trial or otherwise prejudice the due administration of justice." Evidence taken, however, established that counsel for Howard University, an employee of the University, first learned of the advertisement when he read it in *The Evening Star* on the evening of its publication. The officials of Howard University responsible for publication did not consult with their attorney on this matter, directly or indirectly, and he had no knowledge that the advertisement was to be published. Accordingly, the Court concludes that Rule 100(3) was not violated.

But this matter cannot be resolved on this narrow ground. A larger issue is presented. An interested party in the litigation has obviously sought to influence public opinion by publishing an advertisement coincident with a jury trial. Counsel for defendants and for the Government recognize that the advertisements might influence juries about to be chosen for trial of the contempt matters which from the outset have already received considerable public attention.

If these advertisements were purposely inserted in the newspapers to influence jurors, Howard University should be held in contempt. After hearing the evidence, however, there is not sufficient proof of such a deliberate purpose. The exact timing of the advertisements in relation to the trial date was largely coincidence but the evidence as a whole clearly shows that the University administration proceeded unconscious of its responsibility to this Court and insensitive to the implications of its actions. The placing of the advertisements resulted from an uncoordinated effort by certain top officials seeking to carry out a sug-

gestion of the University's former President made shortly before he left the country. No legal advice or competent public relations assistance was obtained.

The affairs of the University are apparently compartmentalized. No official would accept full responsibility for what was done. This is the first instance that officials could recall that Howard University had placed advertisements of any consequence in newspapers. The public relations director expended some $4,000 for this purpose, not only without consulting counsel but he asserts that in spite of his position he had no knowledge of the trial dates or the status of the contempt proceedings involving the students although these matters related directly to the very public relations situation that the University was apparently attempting to meet through the advertisement. For some inexplicable reason the public relations director considered the Court proceedings beyond his sphere of interest. No satisfactory explanation was given, moreover, as to why the advertisement did not reveal its origin explicitly by attributing the statement to Howard University, a circumstance which should perhaps have alerted responsible publishers to decline the proffered advertising revenue in the interests of a fair disclosure.

The Court has concluded that in the light of these circumstances which fall short of contempt it will nonetheless be difficult if not impossible to select an impartial jury for the remaining trials scheduled this month. A remaining question is presented as to what further should be done under these circumstances. Obviously criminal contempt trials by their very nature require prompt, decisive dispositions. The defendants awaiting trial in these cases, moreover, for good reason seek immediate trial. Most of them are college students who do not reside in the District of Columbia. They are, in some instances, being held in this jurisdiction by the terms of their personal recogni-

zance or other bond. Many of them have summer employment elsewhere in aid of their educational plans and given the transient nature of the student campus community essential witnesses from among graduating students or others may well be lost if there is undue delay.

The Court's auspices were invoked by Howard University which now most unwisely has acted in a manner that frustrates the Court's ability to proceed promptly. Substantial delay is in prospect before the cases can be rescheduled due to priority that must be given to very serious criminal matters already specially calendared for the remaining summer months. Since the University has been so insensitive to the Court's requirements and frustrated the Court's ability to afford a prompt, fair and speedy trial, defendants' Sixth Amendment rights must be recognized and the above-captioned cases are dismissed.

Throughout this matter the Court has emphasized that it is not the Court's responsibility to settle the apparently wide differences which exist between various student and faculty factions. These differences have led to deep unrest on the campus now for a substantial period of time and it should be obvious to all concerned that no educational institution can function successfully in a state of semi-siege. A court of equity can to some degree protect property and persons against turbulent conduct, but it cannot resolve the underlying controversies. A lasting solution requires moral leadership, sensitive insight and tolerance on all sides. The Court expresses the hope that University officials will make responsible use of the summer months to achieve genuine progress on the problems at hand and that when students return to the campus they will resort only to reason and permissible forms of dissent. It would be highly regrettable if the Court's intervention is again required.